UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | 2:17-cr-00558-MHH-JHE |
| | } | |
| RAYMOND LAMAR BERRY, | } | |
| | } | |
| Defendant. | } | |
| | } | |

## MEMORANDUM OPINION AND ORDER

Raymond Berry is charged in a one-count indictment as a felon in possession of a firearm – technically, the crime of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). (Doc. 1, pp. 1-2). Mr. Berry asks the Court to suppress evidence that law enforcement officers obtained when they responded to a 911 call concerning a suspicious attempt to purchase syringes at a pharmacy. Mr. Berry contends that the United States should not be able to use the evidence because the evidence is the product of an unconstitutional seizure. (Doc. 12). This opinion resolves Mr. Berry's motion to suppress.

**FACTUAL BACKGROUND**

On the morning of August 21, 2017, Corporal Matthew McGill of the Jefferson County Sheriff's Department received a dispatch call concerning a

1

suspicious person at a Rite Aid Pharmacy in Pinson, Alabama. (Doc. 18, pp. 3-6). According to the dispatcher, three people -- two males and a female -- visited the Rite Aid together, and one of the three tried to buy syringes. (Doc. 18, pp. 7-8). The individual who tried to buy the syringes did not have a valid prescription, and the individual "could [not] prove that they would need these syringes." (Doc. 18, p. 7). The pharmacist was unwilling to sell the syringes to the individual who requested them. (Doc. 18, p. 31). In his 19 years as a law enforcement officer, Corporal McGill has been in situations involving drug users and syringes. (Doc. 18, p. 14). Based on his training and experience, Corporal McGill knows that drug users sometimes try to buy syringes "over the counter without a prescription." (Doc. 18, p. 31).

The dispatcher described the three individuals this way: "One black male had on an orange shirt. The white female with shorts on, brown hair and another black male in a black polo shirt." (Doc. 18, p. 8). Dispatch reported that when the three individuals walked out of the pharmacy, they got into a black Honda Accord. (Doc. 18, p. 8). When Corporal McGill arrived at the Rite Aid a few minutes after receiving the dispatch call, he saw a car fitting the description he had received in the parking space nearest the front door of the pharmacy. (Doc. 18, pp. 8, 10; *see also* Doc. 17-1, p. 1).

Deputy Scott also responded to the dispatch call and arrived at the Rite Aid at nearly the same time as Corporal McGill. (Doc. 18, pp. 23, 25). Both Corporal McGill and Deputy Scott were driving marked cars, and they were dressed in uniforms. (Doc. 18, p. 13). Deputy Scott stopped her vehicle directly behind the black Honda Accord, blocking the Accord's path. Officer McGill stopped his car to the side of the Accord. (Doc. 17-1, p. 1; Doc. 18, pp. 10, 24, 28). As soon as they stopped their cars, both law enforcement officers got out of their cars and moved towards the Accord. In the Accord's driver's seat, Corporal McGill saw a black male wearing an orange shirt. (Doc. 18, pp. 12-13). Corporal McGill saw a front seat passenger wearing a dark shirt, and he saw a white woman in the back of the car. (Doc. 18, pp. 13-14). Neither Corporal McGill nor Deputy Scott saw the Accord's occupants walk out of the Rite Aid, and neither officer saw one of the car's occupants commit a crime. (Doc. 18, pp. 25-26).

As he approached the car, Corporal McGill saw the driver "make a furtive move with is right hand," so Corporal McGill instructed everyone in the Accord to show their hands. (Doc. 18, pp. 14-15, 26). Corporal McGill used a commanding voice when he gave the instruction. (Doc. 18, p. 16). After the Accord's occupants complied, Corporal McGill ordered the driver to get out of the car. The driver, who eventually was identified as Mr. Berry, stepped out of the car, and Corporal McGill began a *Terry* pat of Mr. Berry. (Doc. 18, pp. 15-17).

Meanwhile, Deputy Scott asked the passenger to step out of the Accord. The passenger, eventually identified as Perry Mixon, did not cooperate; he tried to run from Deputy Scott. (Doc. 18, pp. 17-18). After ordering Mr. Mixon to stop and receiving no response, Deputy Scott used her Taser to stop him. (Doc. 18, pp. 18-19). Corporal McGill handcuffed Mr. Berry while Deputy Scott was trying to subdue Mr. Mixon because Corporal McGill had to control Mr. Berry and the female in the back seat of the Accord. (Doc. 18, pp. 19-20). When Deputy Scott gained control of Mr. Mixon, Corporal McGill returned to his pat down and saw the butt of a handgun sticking out of Mr. Berry's right front pocket. (Doc. 18, p. 20). Corporal McGill immediately seized the gun. (Doc. 18, p. 20).

Without advising Mr. Berry of his rights, Corporal McGill asked him if he (Mr. Berry) had a valid pistol permit. Mr. Berry stated that he did not have a permit. (Doc. 18, p. 21). Corporal McGill then placed Mr. Berry under arrest for carrying a pistol without a license. (Doc. 18, p. 21). Still without advising Mr. Berry of his rights, Corporal McGill asked him if he had ever been to jail, and Mr. Berry admitted that he had served 20 years in prison for murder. (Doc. 18, pp. 21-22).

At the suppression hearing in this case, Corporal McGill testified that asking to buy syringes is not a crime. (Doc. 18, p. 27). Corporal McGill acknowledged that his interaction with the passengers in the Accord constituted a brief

4

investigatory stop, and he testified that when he ordered Mr. Berry to step out of the car, he did not have articulable suspicion that Mr. Berry had committed a crime. (Doc. 18, pp. 29, 32-33).

On this record, Mr. Berry asks the Court to exclude the evidence that Corporal McGill gathered because Mr. Berry contends that the stop was unconstitutional. (Doc. 12).

**DISCUSSION**

The Fourth Amendment prohibits an unreasonable seizure of an individual. *California v Hodari D.*, 499 U.S. 621 (1991). For purposes of the Fourth Amendment, a seizure occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In determining whether law enforcement officers have seized an individual, a court may consider, for example, the extent to which law enforcement officers blocked the individual's path, the length of time law enforcement officers detained and questioned the individual, the number of police officers present relative to the number of individuals stopped, the officers' display of weapons, and the language and tone of the voice used by police. *Michigan v Chesternut*, 486 U.S. 567, 573-74 (1988); *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991).

It is undisputed that Corporal McGill and Deputy Scott seized Mr. Berry. Deputy Scott pulled her vehicle directly behind the Honda Accord in which Mr. Berry was sitting, blocking his ability to drive away from the pharmacy where the Honda was parked. In addition, when he arrived, Corporal McGill got out of his car, walked toward the Honda and, using a commanding voice, ordered Mr. Berry to show his hands and get out of the car. Under these circumstances, a reasonable person would conclude that he was not free to leave. *Childs v. DeKalb Cty., Ga.*, 286 Fed. Appx. 687, 695 (11th Cir. 2008) (suspects seized when, among other things, police used blue lights, blocked suspects' path with patrol car, and ordered suspects to exit vehicle). Because it is undisputed that Mr. Berry was seized, this Court must determine whether the seizure was unreasonable.

Under the Fourth Amendment, a law enforcement officer acting without a warrant may briefly stop and detain an individual if the officer has an objectively reasonable suspicion that the individual engaged in or was about to engage in criminal conduct. *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). The United States bears the burden of proving the reasonableness of a warrantless seizure: "[t]he government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement" so as to render the warrantless seizure "reasonable within the

meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983); *see also Illinois v. Wardlaw*, 528 U. S. 119, 140 (2000).

> In *Terry,* the Supreme Court adopted "a dual inquiry for evaluating the reasonableness of an investigative stop." *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (citing *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879); *see also United States v. Powell,* 222 F.3d 913, 917 (11th Cir.2000). Under *Terry* 's two-part inquiry, we first examine "'whether the officer's action was justified at its inception,'" *Powell,* 222 F.3d at 917 (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879), which turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime, *id.* In the second part of the inquiry, determining whether the stop went too far and matured into arrest before there was probable cause, we consider "'whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879).

*Acosta*, 363 F.3d at 1144-45.

Mr. Berry argues that Corporal McGill and Deputy Scott lacked reasonable suspicion because Corporal McGill testified that attempting to buy syringes is not a crime and because Corporal McGill testified that he had no articulable suspicion that Mr. Berry had committed a crime. The argument is not persuasive.

First, while it is not a crime to buy syringes, Corporal McGill and Deputy Scott had a good deal of additional information that would cause a reasonable officer, using his or her experience and training, to suspect that a crime may have been or might about to be committed. *United States v. Powell*, 222 F.3d at 917. As Corporal McGill testified, he and Deputy Scott arrived at the pharmacy because

the pharmacy had called the police to report "suspicious activity inside the business." (Doc. 18, p. 29; *see also* Doc. 18, p. 5). Pharmacy employees were concerned because three individuals had entered the pharmacy, and one of them had tried to buy syringes without a prescription for medication that would require a syringe. Pharmacy employees, like law enforcement officers, no doubt know from their training and experience that an individual who tries to buy syringes without an apparent medical need often may use the syringes to administer illegal drugs. Indeed, pharmacy employees must be aware of the potential for misuse of the pharmacy's products because a pharmacy faces potential liability if it deliberately ignores an inadequate prescription. *See generally* United States Drug Enforcement Administration, Office of Diversion Control, "Pharmacist's Manual: An Informational Outline of the Controlled Substances Act," *available at* https://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/pharm_manual.pdf, p. 29 ("the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted along with the issuing practitioner"). A reasonable officer could rely upon this report of suspicious behavior, respond to the call, and investigate the basis for the call. *Adams v. Williams*, 407 U.S. 143, 146-47 (1972); *United States v. Fields*, 178 Fed. Appx. 890, 892 (11th Cir. 2006).

A reasonable officer would direct his investigation to three individuals sitting in a dark Honda Accord outside of the pharmacy because the pharmacy employee who called to report the suspicious activity told the 911 dispatcher that the three suspicious individuals who were trying to buy syringes left the pharmacy and got into a black Honda Accord. (Doc. 18, p. 8). Admittedly, eight minutes passed from the time the pharmacy called 911 until the time that Corporal McGill arrived at the pharmacy, but as he pulled in and got out of his car, he not only saw a dark Honda Accord, but he also saw a man in the Accord who matched the description that the pharmacy employee provided to dispatch of one of the men engaged in suspicious conduct. (Doc. 18, pp. 11-12). And as he walked closer to the Accord, Corporal McGill saw another man and a woman, again consistent with the description of the three individuals who purportedly entered the pharmacy to buy syringes. (Doc. 18, pp. 13-14).

Then, before Corporal McGill reached the Accord, he observed the individual in the driver's seat – later identified as Mr. Berry – making furtive movements. (Doc. 18, p. 14).

Even if there could be an innocent explanation for each of these factors, the factors in combination – the suspicious person call, the Accord and its occupants matching the description provided to police of the suspicious individuals, and the furtive movements of the driver when Corporal McGill arrived – supply an

adequate basis for a reasonable officer to investigate further. *Terry*, 392 U.S. at 22.

By analogy, as the Supreme Court held in *Terry*,

> There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further.

392 U.S. at 22-23. A reasonable officer at the scene would have an adequate basis to question the occupants of the Accord to investigate whether criminal activity was afoot.

This is particularly so given the fact that Mr. Berry and his companions were near the entrance of a pharmacy in which pharmacy employees and pharmacy customers were located. A reasonable law enforcement officer will pay particular attention to potential criminal conduct when innocent individuals may be at risk. *Wardlow*, 528 U.S. at 123, 125 (when officers confront an individual in the public arena, though the individual may be engaged in lawful conduct, officers may detain the individual to confirm that that is the case); *United States v. Lewis*, 674

F.3d 1298, 1305-06 (11th Cir. 2012) (detention of four men for questioning was reasonable for safety reasons because officer knew that the men were in possession of two firearms).

After Corporal McGill saw the driver's furtive move, matters escalated. Corporal McGill asked Mr. Berry to step out of the car so that he (Corporal McGill) could conduct a *Terry* pat. When Deputy Scott asked Mr. Berry's front seat passenger to step out of the car for a *Terry* pat, he tried to run. Moments later, Corporal McGill noticed the butt of a gun in Mr. Berry's pocket. The stop did not go too far.

## CONCLUSION

Accordingly, the Court denies Mr. Berry's Amended Motion to Suppress Evidence. (Doc. 12). The gun that Mr. Berry was carrying is admissible.[1]

**DONE** and **ORDERED** this October 29, 2018.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[1] The United States may prove the charge against Mr. Berry by demonstrating beyond a reasonable doubt that Mr. Berry possessed a firearm, that the firearm travelled in interstate commerce, and that Mr. Berry was a convicted felon when he possessed the firearm. The United States does not have to prove that Mr. Berry did not have a license for the firearm.

11